IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

JIM R. HARRIS, JR.,                     )
                                        )
                Movant,                 )
                                        )
        vs.                             )   No. 1:19 CV 00053 SNLJ
                                        )
UNITED STATES OF AMERICA,               )
                                        )
                Respondent.             )

## MEMORANDUM AND ORDER

This case is before the Court on Movant's Section 2255 Petition, which has been fully

briefed.

## FACTS

**A.     The Indictment.**

On May 20, 2010, a Grand Jury in the Eastern District of Missouri, Southeastern

Division, returned an Indictment against Harris, charging him with three counts of violations of

various federal statutes. Count I charged Harris with Interference with Commerce by Threat or

Violence in violation of Title 18, U.S.C. § 1951. Count II charged Harris with Possession of a

Firearm in Furtherance of a Crime of Violence in violation of Title 18, U.S.C. § 924(c). Count

III charged Harris with being a previously convicted felon in possession of ammunition that

affected interstate commerce in violation of *18 U.S.C. § 922(g)(1)*. Harris was transferred from

the Scott County jail pursuant to a writ in order to face the federal charge. His Initial

Appearance was before United States Magistrate Judge Lewis M. Blanton on April 19, 2010.

The Federal Public Defender's office was appointed to represent Harris. Assistant Federal

Defenders Michael A. Skrien ("AFPD Skrien") and Scott F. Tilsen ("AFPF Tilsen") each filed an

1

Entry of Appearance. AFPD Skrien appeared on behalf of Harris at an arraignment on April 21,

2010.    At that arraignment, Harris pled not guilty to the charges. Judge Blanton set Harris's

pretrial motions hearing for May 14, 2010.

**B.    Pretrial Motions.**

On May 3, 2010, AFPD Tilsen filed a motion asking for an extension of time to file

pretrial motions. That motion was granted by Judge Blanton on May 23, 2010. A new hearing

date of July 8, 2010, was set by the Court.

On June 17, 2010, AFPD Tilsen filed his second motion for an extension of time to file

pretrial motions. That motion was granted on June 18, 2010, but the date for the hearing

remained the same.

On June 28, 2010, AFPD Tilsen filed a Waiver of Filing of Pretrial Motions on behalf of

Harris. On July 8, 2010, Harris appeared before Judge Blanton and waived his right to file

pretrial motions.

On July 28, 2010, AFPD Tilsen filed a Motion to Withdraw Waiver of Pretrial Motions

and Permission to File Pretrial Motions. The Government consented to that request. On July

29, 2010, this Court granted Harris permission to file pretrial motions. A new pretrial motion

hearing date of September 13, 2010, was set before Judge Blanton.

On August 18, 2010, AFPD Tilsen filed his second Waiver of Filing of Pretrial Motions.

AFPD Tilsen also requested an earlier date to waive pretrial motions. Both of those requests

were granted. On August 27, 2010, Harris again appeared before Judge Blanton and waived his

right to file pretrial motions. This Court set the case for a plea hearing on September 3, 2010.

On that date, Harris appeared and requested that his plea hearing date be continued.

This Court set the date for Harris' guilty plea for September 27, 2010.

2

On September 27, 2010, AFPD Tilsen and AFPD Skrien each filed motions to withdraw as counsel for Harris. That motion was granted on September 28, 2010. David Pearson was appointed as attorney for Harris. A new plea hearing date of October 20, 2010, was set for Harris. On October 13, 2010, Pearson filed a motion to continue the plea hearing. That request was granted and the plea hearing was reset for November 22, 2010. On that date, Harris appeared and requested that his case be set for a jury trial. He also requested permission to proceed pro-se.  A Motion hearing date of December 13, 2010, was set for any motions related to those issues.

On December 13, 2010, Pearson was allowed to withdraw as counsel. Eric Butts was appointed to represent Harris. A jury trial was set for January 26, 2011. Harris waived his right to a Speedy Trial.

On January 13, 2011, Butts filed a Motion to Continue the Jury Trial. That motion contained a Speedy Trial Waiver signed by Harris. The trial was continued to March 28, 2011.

On March 1, 2011, Butts filed a Motion to Withdraw Waiver of Pretrial Motions and Permission to File Pretrial Motions. A hearing on that motion was scheduled for March 14, 2011. On that date, the hearing was continued at Harris' request, to March 28, 2011. Harris also filed a Waiver of Speedy Trial as part of his request. On April 8, 2011, Judge Blanton granted Harris' request and allowed him to file pretrial motions. A hearing date for pretrial motions was set for April 26, 2011. On April 12, 2011, Harris asked for more time to prepare his filing of pretrial motions. That motion was granted, giving Harris until April 21, 2011, to file pretrial motions. A hearing date for pretrial motions was set for May 6, 2011.

On April 21, 2011, Harris filed a Motion to Suppress Evidence and Statements. The

3

Government filed its Response to that Motion on April 28, 2011. On May 6, 2011, an evidentiary hearing was held regarding Harris' Motion to Suppress. Harris also filed a motion on August 9, 2011, seeking to represent himself in filing responses supporting his Motion to Suppress. On August 30, 2011, Judge Blanton issued an Order allowing Harris to file pro-se responses and that the Government would have seven days to answer those pleadings at its discretion.

On October 3, 2011, Judge Blanton issued his Report and Recommendation, recommending that Harris' Motion to Suppress Evidence and Statements be denied. United States District Judge Carol E. Jackson was assigned to hear further matters. On October 21, 2011, Butts filed an Objection to the Report and Recommendation. On November 21, 2011, Judge Jackson adopted the Report and Recommendation and denied Harris' Motion to Suppress Evidence and Statements. The jury trial was set for December 12, 2011.

**C.     The Plea Agreement.**

A few days before the scheduled trial date, Harris' attorney and the Government worked out a written Plea Agreement. That agreement was a "binding" plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). (Plea Agreement; p. 2) The essence of a "binding" plea agreement is that the parties agreed that Harris should serve a total sentence of twenty years and that the District Court's only choice was to approve of the agreement or reject it and permit Harris to proceed to trial. (Plea Agreement; pp. 2, 3) As part of its agreement, the Government agreed to withdraw its previously filed Notice of Sentence Enhancement. (Plea Agreement; p. 3) That Notice would have required that, upon conviction of the charges in the Indictment, Harris would have been required by Title 18, U.S.C. § 3559 to receive a mandatory sentence of life imprisonment. (Plea Agreement; p. 3)

4

**D.    Guilty Plea.**

Harris and his attorney, Eric Butts, appeared before this Court on December 9, 2011, in order to enter into a plea agreement with the Government. This Court agreed to take the plea in the absence of Judge Jackson. (Plea Tr., p. 3) Judge Jackson was the District Court judge assigned to hear the case, but the parties and Judge Jackson agreed that this Court could take the guilty plea since Harris' request for a guilty plea came shortly before the scheduled trial date. Judge Jackson was still assigned the case and would be responsible for the sentencing hearing.

Harris was sworn to tell the truth by the District Court Clerk and examined by this Court. (Plea Tr., p. 3) Harris agreed that he could read and write (Plea Tr., p. 4) and that there were no illnesses or infirmities that affected his willingness to plead guilty (Plea Tr., p. 4). Harris was asked whether he was satisfied with his attorney.  His reply was, "To a certain degree, yes."  (Plea Tr., p. 5)  This Court and Harris' counsel informed Harris that he could still proceed to trial the next Monday, the day set aside for his trial. (Plea Tr., p. 5) After that exchange, Harris told this Court the following:

| | |
|---|---|
| Court: | What problems do you have with Mr. Butts? |
| Harris: | Well, I don't have any problems now. I thought your question was have I had any problems. I don't have any problems now, no. |
| Court: | Okay. Well, maybe - - |
| Harris: | Okay. |
| Court: | - - I asked the question in a wrong way. So you're satisfied with the way he's handled your case at this point then? |
| Harris: | Right. |
| Court: | You had some concerns in the past? |

5

| | | |
|---|---|---|
| Harris: | Yes. | |
| Court: | Those have all been resolved? | |
| Harris: | Yes. | |
| Court: | No question about it then? | |
| Harris: | Right. | |
| Court: | Okay. Well, let me ask you a few more questions then. I - - I guess I misunderstood your responses then. You're satisfied with the way he's investigated the case then, is that right? | |
| Harris: | Right. | |
| Court: | Now, has he talked to the witnesses, if any, that you told him about and others that he's known about? Has he done that kind of thing? | |
| Harris: | Yes. | |
| Court: | He's done everything you've asked him to do at this point then? | |
| Harris: | Yes. | |
| Court: | So, again, you're - - you're fully satisfied with the way he's represented you? | |
| Harris: | Yes. | |
| Court: | He's explored all those defenses that might have been raised and raised those if they were proper and told you why if they weren't proper, that kind of thing? | |
| Harris: | Yes. | |

(Plea Tr., pp. 7, 8)

This Court also asked Harris about his knowledge of the contents of the written Plea

6

Agreement:

| Court: | Now, the lawyers have given me a written Plea Agreement that consists of 18 pages, and I see that you and both lawyers have signed it on page 18, is that right? |
|---|---|
| Harris: | Yes, sir. |
| Court: | Have you read the agreement? |
| Harris: | Yes. |
| Court: | Have you gone over it in detail with your lawyer? |
| Harris: | Yes. |
| Court: | And has he explained the contents of the agreement? |
| Harris: | Yes, he has. |
| Court: | Do you understand the contents of the agreement? |
| Harris: | Yes, I do. |
| Court: | Is there anything in here that you do not understand? |
| Harris: | No. |

(Plea Tr., pp. 9, 10)

This Court then discussed the binding nature of the plea agreement and that, if Judge Jackson rejected the Plea Agreement, that Harris would be allowed to revoke his guilty plea:

| Court: | Now, do you understand, too, that if - - whenever I or Judge Jackson accepts the Plea Agreement then you won't be allowed to withdraw your plea; you understand - - |
|---|---|
| Harris: | Yes. |
| Court: | - - that, too? |

7

(Plea Tr., p. 10)

| | |
|---|---|
| Court: | All right. So if - - so I understand, if the Court decides not to accept the 20-year, agreed-on sentence, then Defendant would be allowed to withdraw his plea of guilty, is that your - - |
| Butts: | Yes, Judge. |
| Court: | Is that the situation? Is that your understanding too? |
| Harris: | Yes, yes. |
| Court: | All right. And then we'd start all over basically? |
| Harris: | Right. |

(Plea Tr., pp. 12, 13)

This Court asked the Government to describe its proof if put to its burden during a trial. The Government informed the Court that its proof was that, on January 28, 2010, Harris had been convicted of four different felony offenses, including two separate Second Degree Robbery convictions. On January 28, 2010, a masked man robbed the Amerimart store in Benton, Missouri, by firing a handgun into the ceiling of that business. The store clerk gave the man $1,533 from the cash register. The man left the store.  The spent cartridge was determined to have been manufactured in a location other than the State of Missouri and affected interstate commerce. The Amerimart store obtained its inventory from suppliers from other states and, therefore, that business affected interstate commerce.

Later investigation revealed that Jim Harris, Jr. was involved in the robbery. Harris later gave a confession to police officers admitting that he was the man who robbed the Amerimart store. Harris listened to the factual statements of the events and agreed that everything the Government said about the commission of the crimes was "true and correct." (Plea Tr., pp. 20 –

8

23) Harris agreed that he was pleading guilty because he was guilty. (Plea Tr., p. 24)

This Court found Harris guilty on all three charges. This Court did not accept the Plea
Agreement, but left that decision to Judge Jackson. Judge Jackson set a sentencing hearing for
February 21, 2012.

**E.      The Presentence Investigation Report.**

After the verdict, the District Court ordered that a Presentence Investigation Report
(P.S.R.) be prepared. United States Probation Officer Paul H. Boyd prepared that report for the
District Court. The P.S.R. recommended that Harris' Total Offense Level be set at 31, pursuant
to U.S.S.G., § 4B1.4(b)(3)(A), as Harris had previously been convicted of at least three violent
felonies. (P.S.R., ¶ 15 - 24) The P.S.R. also reflected numerous felony and misdemeanor
convictions for Harris, detailed in the following paragraphs.

On October 21, 1982, Harris was convicted of the felony of Second Degree Robbery in
the Circuit Court of Mississippi County, Missouri in Case Number CR182-8F. Harris was
sentenced to a term of imprisonment of eight years for that conviction. This conviction was
determined to be a "violent felony" for purposes of classifying Harris as an Armed Career
Criminal. (P.S.R., ¶ 34)

On November 25, 1987, Harris was convicted of the misdemeanor of Passing Bad Check
in the Circuit Court of Scott County, Missouri, in Case Number CR587-835M. Harris was
sentenced to serve a year in jail for that conviction, but his sentence was suspended. Harris was
placed on probation for one year. (P.S.R., ¶ 35)

On July 28, 1988, Harris was convicted of the misdemeanor offense of Fraudulent Use of
a Credit Device in the Circuit Court of Scott County, Missouri, in Case Number CR588-385M.
Harris' jail sentence was suspended and he was placed on probation for two years. (P.S.R., ¶

36)

On October 16, 1991, Harris was convicted of the felony of Possession of a Stolen Motor Vehicle in the Circuit Court of Cook County, Illinois, in Case Number 91CR0557901. Harris was sentenced to a term of imprisonment of three years for that conviction. (P.S.R., ¶ 37)

On October 16, 1991, Harris was convicted of the felony of Burglary in the Circuit Court of Cook County, Illinois, in Case Number 91CR1640901. Harris was sentenced to a term of imprisonment of three years for that conviction. This conviction was determined to be a "violent felony" for purposes of classifying Harris as an Armed Career Criminal. (P.S.R., ¶ 38)

On February 19, 1997, Harris was convicted of the felony of Aggravated Possession of a Stolen Motor Vehicle in the Circuit Court of Cook County, Illinois, in Case Number 95CR1982301. Harris was sentenced to a term of imprisonment of seven years for this conviction. This conviction was determined to be a "violent felony" for purposes of classifying Harris as an Armed Career Criminal. (P.S.R., ¶ 39)

On May 17, 1996, Harris was convicted of the felony of Possession of a Stolen Motor Vehicle in the Circuit Court of Cook County, Illinois, in Case Number 95C22087901. Harris was sentenced to a term of imprisonment of six years for this conviction. (P.S.R., ¶ 40)

On April 8, 1999, Harris was convicted of the felony of Possession of Stolen Property in the Circuit Court of Scott County, Missouri, in Case Number CR599-299FX. Harris received a sentence of three years imprisonment for this conviction. (P.S.R., ¶ 41)

On September 13, 2002, Harris was convicted of the felony of Tampering – First Degree in the Circuit Court of Scott County, Missouri, in Case Number 02CR744542. Harris received a sentence of five years imprisonment for that conviction. (P.S.R., ¶ 42)

On March 11, 2003, Harris was convicted of the felony of Second Degree Robbery in the

Circuit Court of New Madrid County, Illinois, in Case Number 02CR752508. Harris received a sentence of imprisonment of five years for this conviction. (P.S.R., ¶ 43)

Harris received a total of 15 criminal history points, resulting in his placement in Criminal History Category VI. (P.S.R., ¶ 44 – 47) The P.S.R. noted that the minimum term of imprisonment, if Harris was classified as an Armed Career Criminal for the charge of being a felon in possession of ammunition, was 25 years. (P.S.R., ¶ 75, 76) This occurred because the mandatory minimum sentence for that charge was 15 years, and the mandatory minimum sentence for the charge of possessing a firearm in furtherance of a crime of violence was 10 years, with that sentence to be served consecutively to the ammunition charge for a total of 25 years. The P.S.R. noted the Government's agreement not to seek a sentence more than 20 years. (P.S.R., ¶ 77, 78)

Harris filed an objection to the P.S.R., contending that his conviction for Aggravated Possession of a Stolen Motor Vehicle was not a violent felony and that his classification as an Armed Career Criminal was improper. The Government did not file a response to Harris' objection, due to the Plea Agreement that was in place.  The Government was aware of cases that established that a conviction for Aggravated Possession of a Stolen Motor Vehicle was a violent felony.  However, the Government was bound by the terms of the Plea Agreement, which required that the Government recommend a term of imprisonment of no more than twenty years. At the time of the guilty plea, the Government was unaware of Harris' Illinois convictions and was unaware of the conviction for Aggravated Possession of a Stolen Motor Vehicle and the Burglary conviction. The Government could not advocate, at that time, that Harris be classified as an Armed Career Criminal, because that would require his statutory minimum sentence to be 25 years, a term longer than the Plea Agreement required. So the

11

Government chose to remain silent.

At the hearing on February 21, 2012, Judge Jackson sustained Harris' objection to the P.S.R. and determined that Harris was not an Armed Career Criminal. (Sent. Hrg. Tr., February 21, 2012, p. 7) Judge Jackson then announced that she was rejecting the binding Plea Agreement and would allow Harris time to decide whether to proceed to trial or maintain his guilty plea without a plea agreement. The Court specifically found that the recommended sentence of twenty years was not in the interests of justice, considering the seriousness of the crimes charged and the manner in which the crimes were perpetrated. (Sent. Hrg. Tr., February 21, 2012, p. 9) The Court gave Harris until March 7, 2012, to file a pleading informing the Court of his decision.

On March 6, 2012, Harris filed a pleading with the Court asking that the sentencing date be continued and informed the Court that Harris would maintain his guilty plea and forgo jury trial. The sentencing hearing was reset for May 29, 2012.

Because the Plea Agreement was no longer in effect, having been rejected by the Court, the Government filed a motion asking the Court to reconsider its ruling concerning Harris' conviction for Aggravated Possession of a Stolen Motor Vehicle. The Government filed its Memorandum citing authority for its position and requested that the Court find that the conviction was a violent felony and find that Harris should be classified as an Armed Career Criminal as having at least three convictions for violent felonies.

The Government's Memorandum also noted the parties' agreement that the Government would recommend a sentence of 300 months, or 25 years, at the new sentencing hearing. Harris agreed to maintain his guilty plea in exchange for the Government's recommendation. (Government's Motion for Reconsideration, filed May 11, 2012, p. 2)

12

On May 29, 2012, all parties and Judge Jackson appeared for the sentencing hearing. Judge Jackson heard argument and decided that Harris' previous conviction for Aggravated Possession of a Stolen Motor Vehicle was a violent felony and that Harris should be classified as an Armed Career Criminal. (Sent. Hrg. Tr., May 29, 2012, pp. 1-12) The Court found that Harris' applicable Guideline range of punishment was 308 to 355 months. (Sent. Hrg. Tr., May 29, 2012, p. 13) The Government recommended a total sentence of 300 months, calculated by the imposition of a mandatory minimum sentence of 180 months for the charge of being a Felon in Possession of a Firearm and a mandatory minimum, consecutive sentence of 120 months for Possession of a Firearm in Furtherance of a Crime of Violence. The Sentence for Interference with Commerce by Threat or Violence would be run concurrently with the firearm possession sentence. Harris' attorney asked for the most lenient sentence possible. (Sent. Hrg. Tr., May 29, 2012, p. 14-17)

After considering the P.S.R. and the argument, Judge Jackson imposed a 300 month sentence consistent with the Government's recommendation. Harris was also ordered to serve a period of supervised release of five years, to pay restitution of $1,684.15, and to pay a special assessment in the amount of $300.00. Judge Jackson informed Harris of his appellate rights. Harris said that he understood those appellate rights. (Sent. Hrg. Tr., May 29, 2012, pp. 20-23)

**F.    The Appeal.**

On June 6, 2012, Harris filed a pro-se Notice of Appeal. On June 8, 2012, Harris' attorney filed a Notice of Appeal. Harris' attorney filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396 (1967).   In that brief, Harris' attorney noted Harris' position that his previous Illinois felony conviction for Aggravated Possession of a Stolen Motor Vehicle should not be classified as a violent felony. The Eighth Circuit allowed Harris to file his own

13

brief and then issued its decision, agreeing that the conviction was a violent felony. *See United States v. Harris*, 499 Fed.Appx. 631 (8th Cir. 2013) On April 1, 2013, Harris filed a pro-se request for a rehearing on his decision. On April 24, 2013, that request was denied. The mandate was issued by the Eighth Circuit Court of Appeals on May 1, 2013. Harris did not file a petition for review by the United States Supreme Court.

**G.     Petition for Post-Conviction Relief Pursuant to § 2255.**

On July 18, 2013, Harris filed his Petition under 28 U.S.C., § 2255, asking that this Court set aside his conviction and sentence in Case Number 1:13 CV 66 CEJ. Harris raised several grounds for relief, including his claim that his prior conviction for Illinois Aggravated Possession of a Stolen Motor Vehicle was improperly classified as a violent felony for Armed Career Criminal sentencing purposes and as a crime of violence for career offender sentencing purposes. The district court denied relief and denied a certificate of appealibility. Harris appealed that decision and this Court agreed to take up Harris' appeal of the denial of a certificate of appealibility in Case Number 16-3942.

After Harris' sentencing date, the Supreme Court issued its decision in *Johnson v. United States*, 135 S.Ct. 2551 (2015), invalidating the ACCA residual clause definition of a violent felony. That decision was held to be retroactively applicable to cases on collateral review, like Harris', by *Welch v. United States*, 136 S.Ct. 1257 (2016). Harris' conviction for Illinois Aggravated Possession of a Stolen Motor Vehicle was only classified as a violent felony due to the residual clause. The Government agrees that Harris' conviction for Illinois Aggravated Possession of a Stolen Motor Vehicle no longer qualified as a violent felony following the decision in *Johnson*. The Government agreed that this case should be remanded back to the district court, so that a new Presentence Investigation Report could be prepared, reflecting the

14

current position of the law for Harris' other felony convictions to determine whether he should be sentenced as an Armed Career Criminal.

**H.    New sentencing hearing.**

Harris' advisory Guideline range was calculated to be 51 to 63 months for Counts I and III, with a range of ten years to life on Count II, with that sentence to run consecutively to all other sentences.  (PSR II, p. 14)    On September 5, 2017, the district court conducted another sentencing hearing for Harris. (DCD 234) The district court imposed a sentence of 63 months for Counts I and III, to be served concurrently, and a further 120 months for Count II, with that sentence served consecutively to the sentences for Counts I and III, for a total of 183 months. The district court announced that the federal sentence would run consecutively to the undischarged portion of Harris' state sentence of fifteen years. (Sent. TR.; September 5, 2017, pp. 22-24)

Harris filed a Notice of Appeal for that sentence in Case Number 17-2971. On October 5, 2018, the Eighth Circuit filed its decision, affirming Harris conviction and sentence.

**I.    Harris' current Section 2255 motion.**

On October 26, 2018, Harris filed a pleading with the Eighth Circuit Court of Appeals in Case Number 18-3289. That pleading was Harris' request for permission to file a successive habeas petition. However, since Harris had not filed a habeas petition after his re-sentencing, he was entitled to file a "first" habeas petition. The Government filed its response, suggesting that the Eighth Circuit remand the petition to the District Court for resolution. The Eighth Circuit agreed and remanded Harris' petition to this Court for a decision on the merits. In the current pleading, styled as Case Number 1:19 CR 00053 SNLJ, Harris makes two complaints.   They are: (1) that Harris' confession during the case investigation to Officer Ourth was tainted due to

15

promises extracted by Ourth; and (2) that Harris was denied his right to represent himself at trial.

Harris has also filed two Motions asking that the Government be required to dismiss his

Indictment for various reasons. Harris also asks that the Government be prohibited from

contacting his witness, Naomi Wince. The Government will address each complaint in turn.

## APPLICABLE LAW

### A.   NEED FOR EVIDENTIARY HEARING AND BURDEN OF PROOF

28 U.S.C. §2255 provides, in pertinent part:

> Unless the motion and the files and records of the case conclusively show that the
> prisoner is not entitled to relief, the court shall . . . grant a prompt hearing thereon.

Rule 4(b) of the Rules Governing Section 2255 Proceedings for the United States District

Court states:

> The motion, together with all the files, records, transcripts, and correspondence
> relating to the judgment under attack, shall be examined promptly by the judge to
> whom it is assigned. If it plainly appears from the face of the motion and any
> annexed exhibits in the prior proceedings in the case that the movant is not
> entitled to relief in the district court, the judge shall make an order for its
> summary dismissal and cause the movant to be notified.

When a petition is brought under Section 2255, the petitioner bears the burden of

establishing the need for an evidentiary hearing. In determining whether petitioner is entitled to

an evidentiary hearing the court must take many of petitioner's factual averments as true, but the

court need not give weight to conclusory allegations, self interest and characterizations,

discredited inventions, or opprobrious epithets. *United States v. McGill*, 11 F.3d 223, 225 (1st

Cir. 1993). A hearing is unnecessary when a Section 2255 motion (1) is inadequate on its face,

or (2) although facially adequate is conclusively refuted as to the alleged facts by the files and

the records of the case. *Id.*, at 225-6. See also *United States v. Robinson*, 64 F.3d 403 (8th Cir.

1995) *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995).

When all the information necessary for the court to make a decision with regard to claims raised in a 2255 motion is included in the record, there is no need for an evidentiary hearing. *Rogers v. United States*, 1 F.3d 697, 699 (8th Cir. 1993). An evidentiary hearing is unnecessary where the files and records conclusively show petitioner is not entitled to relief. *United States v. Schmitz*, 887 F.2d 843, 844 (8th Cir. 1989); *Dall v. United States*, 957 F.2d 571, 573 (8th Cir. 1992).

### B.   INEFFECTIVE ASSISTANCE OF COUNSEL

To prevail on a claim alleging ineffective assistance of counsel, the movant must satisfy the two-part test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). Under *Strickland*, the movant must first show that the counsel's performance was deficient. 466 U.S. at 687. This requires the movant to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Secondly, the movant must demonstrate that the deficient performance prejudiced the defense so as "to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* The movant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The Eighth Circuit has described the two-fold test as follows: (1) counsel's representation fell below an objective standard of reasonableness; and (2) but for this ineffective assistance, there is a reasonable probability that the outcome of the trial would have been different. *Rogers v United States*, 1 F.3d 697, 700 (8th Cir. 1993). More recently the Eighth Circuit has described the *Strickland* test as follows: "Whether counsel's performance was in fact deficient and, if so, whether the defendant was prejudiced by the inadequate representation. If we can

17

answer 'no' to either question, then we need not address the other part of the test." *Fields v.*

*United States*, 201 F.3d 1025, 1027 (8th Cir. 2000).

When evaluating counsel's performance, the court "must indulge in a strong presumption

that counsel's conduct falls within the wide range of reasonable professional assistance."

*Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.  Counsel's performance is considered

objectively, and gauged "whether it was reasonable 'under prevailing professional norms' and

'considering all the circumstances.'" *Fields*, 201 F.3d at 1027, quoting *Strickland*, 466 U.S. at

688, 104 S.Ct. at 2064-65. Counsel's challenged conduct is viewed as of the time of his

representation. "And we avoid making judgments based on hindsight." *Fields*, 201 F.3d at

1027. A reviewing court's "scrutiny of counsel's performance must be highly deferential."

*Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

## DISCUSSION

**Ground One:   Improper tactics to obtain Harris' confession.**

In this issue, Harris contends that his confession to Scott County Officer Ourth was

coerced by Ourth's agreement to let Harris see his girlfriend and by promises of some kind of a

deal to avoid punishment. Harris contends that this ground demonstrates that he is "actually

innocent" of the charges. Specifically, Harris alleges as follows:

> Petitioner asserts, the newly discovered evidence . . . would have been enough
> to establish that no jury would of found Harris guilty of the offense, because this
> evidence support petitioner's claim that Officer Ourth was not only an unreliable
> or credible witness, but this officer was not in any position to arrest or charge
> anyone as he was corrupt.

Harris' Section 2255 Petition, pp. 1, 2.

> This evidence further support petitioner's claim that petitioner is actually
> factually innocent, . . ., as there is no physical evidence that links Harris to
> the crime, (other than coerced statements) . . .

18

Harris' Section 2255 Petition, p. 2.

> Harris is innocent of this conviction, and the evidence (i.e. testimony) used
> to secure the charges against him were obtained through the use of coercion.
> A confession in exchange for going to see his girlfriend Naomi Wince
> (Peaches), which our Supreme Court . . . has condemned.

Harris' Section 2255 Petition, p. 2.

When Harris filed his petition with the Eighth Circuit, he also filed three attachments.

The first is styled "Motion to Supplement Pending Claim/Requesting Copy Docket Sheet". The

second pleading is styled "Motion to Supplement Pending Claim With Newly Discovered

Evidence in Support". The third pleading is styled "Sworn Affidavit of Naomi Wince".

The first document, "Motion to Supplement Pending Claim/Requesting Copy Docket

Sheet" contains further allegations as to Harris' complaints on the first issue. In that pleading,

Harris states:

> . . . the ongoing documents will support Harris's claim that he was made a
> deal to see his girlfriend in exchange for a confession of admitting to
> committing the crimes, which he did not do, and that Officer Greg Ourth
> lied to Harris and his girlfriend Naomi Wince about talking to the Judge
> and the prosecutor to make a deal for long term treatment.

Harris' "Motion to Supplement Pending Claim/Requesting Copy Docket Sheet", p. 1.

> During the second taped hearing held February 26, 2010, if this Court
> would seek and examine the contents of this recording, this Court will
> hear Officer Gregg Ourth stating to Harris "Just you and I are going over
> to Peaches." This was to get Peaches to say it was okay to take the long
> term treatment so I could be back home in one year, by confessing to the
> crimes.
> Petitioner unequivocally asserts, if this language is not found on this recording
> of the tape, it is because the Sheriff Office has altered it and this Court should
> have the tape examined to show that the tape has been cut or spliced.

Harris' "Motion to Supplement Pending Claim/Requesting Copy Docket Sheet, p. 2.

> In the Report and Recommendation of Magistrate Judge Lewis M. Blanton,

> . . . the language recorded from the tape is clearly recited in part. This is
> when the deal to take me to see Peaches in exchange for my confession was
> made, and Officer Ourth did in fact take me to see her in Charleston.
> . . .
> Officer Ourth is asked about taking me to see Naomi Winston, and Ourth
> responds "Briefly."

Harris' "Motion to Supplement Pending Claim/Requesting Copy Docket Sheet, p. 2.

The substance of Harris' claim in this pleading is his assertion that his confession to

Officer Ourth was obtained by a promise for Harris to get to visit with Naomi Wince, also known

as Naomi Winston, also known as "Peaches". Harris believes that this was a form of coercion

and that his confession to Ourth should have been ruled inadmissible.

Harris submitted the affidavit of Naomi Wince as part of his Section 2255 petition.  In

that affidavit, Wince states that Officer Gregg Ourth brought Harris to see Wince after his arrest

for an assault that was unrelated to the instant federal case. Wince states that Ourth told her that

Ourth and Harris had made a "deal for Jim [Harris] to get long term treatment and that Jim would

be back home in one year if he took the deal." Harris offers the affidavit of Wince as proof that

there was some kind of coercion on the part of the officer to get Harris to confess to his crime by

allowing Harris to speak with Wince.

Harris' first problem to overcome is the fact that no confession of his was used in order to

obtain his conviction. Harris pled guilty to his charges, admitting that he committed all of the

offense conduct. No matter what he thinks of the validity of his confessions, his conviction was

obtained solely by the use of Harris' guilty plea statements.

Other cases have held that a defendant has no right to an evidentiary hearing to determine

whether their confessions were coerced or not where the defendant has pled guilty to the charge.

In *Smith v. United States*, *618 F.2d 507* (8th Cir. 1980), the defendant filed a habeas petition to

20

challenge his conviction, asserting, among other grounds, that his confession was coerced. *Smith*, 618 F.2d at FN 2. The *Smith* Court noted that, since Smith pled guilty, his allegedly coerced confession was not used against him. Smith's habeas claim was denied on this point.

The same issue was raised in *Binder v. United States*, 2007 WL 1577658 (W.D.Missouri May 31, 2007) as is raised here by Harris. In *Binder*, the defendant filed a habeas petition claiming that his conviction was obtained by a coerced confession, an illegal search and an unlawful arrest. Binder, like Harris here, did not raise those issues on appeal. The *Binder* Court noted that constitutional claims asserted by Binder, but not raised on direct appeal, could not be considered in a Section 2255 petition. *Binder*, at * 1.

The defendant in *Stolts v. United States*, 2010 WL 1257681 (8th Cir. 2010) made the same claim as made here by Harris. Stolts claimed that his confession (used in his trial) was coerced and that his conviction should be set aside. Stolts' claims were dismissed, based on the District Court's finding that Stolt's had failed to file a direct appeal of that very issue:

> Movant did not raise this issue in his direct appeal. Movant's claim that the conviction was obtained by use of a coerced confession could have been raised on direct appeal of his conviction. If a claim could have been raised on direct appeal but was not, it cannot be raised in a § 2255 motion unless the movant can show both (1) a "cause" that excuses the default, and (2) "actual prejudice" resulting from the errors of which he complains. *See Frady*, 456 U.S. at 168; *Matthews v. United States*, 114 F.3d 112, 113 (8th Cir.1997), *cert. denied*, 522 U.S. 1064, 118 S.Ct. 730, 139 L.Ed.2d 668 (1998). If a movant is unable to show "cause" and "actual prejudice," he must make a "substantial claim that constitutional error has caused the conviction of an innocent person. .." *Schlup v. Delo*, 513 U.S. 298, 321, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). A claim of actual innocence must be based on "new evidence," and must convince the Court that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327. *See also Embrey v. Hershberger*, 131 F.3d 739, 741 (8th Cir.1997) (applying *Schlup* actual innocence standard in the context of a § 2255 motion), *cert. denied*, 525 U.S. 828, 119 S.Ct. 78, 142 L.Ed.2d 61 (1998). A movant's pro se status does not excuse procedural default. *Stewart v. Nix*, 31 F.3d 741, 743 (8th Cir.1994) (citing *Stanley v. Lockhart*, 941 F.2d 707, 710 (8th Cir.1991)). Movant has not attempted to show cause and

21

> prejudice and does not assert actual innocence, and therefore this ground is
> procedurally barred.

*Stolts*, * 3.

The law is clear that a defendant who knows about a constitutional claim, but fails to

raise it on direct appeal, may not pursue that issue in a habeas petition, unless his claim asserts

"cause and prejudice" or "actual innocence". Harris attempts to use the "actual innocence route,

but completely fails to provide any new evidence that no juror would have found him guilty of

the charges. Harris ignores his burden of proof on the issue of actual innocence and simply

presumes his innocence. After being convicted of that offense, Harris is no longer entitled to

the presumption of innocence.

Harris committed procedural default by not raising this issue on direct appeal. If he

wanted to appeal the claim that his confession was coerced, he should have stood trial and then

appealed that issue. He declined to do so, and instead pled guilty and raised other grounds on

appeal. His procedural default of the issue of a coerced confession should result in the dismissal

of this claim.

A secondary problem with Harris' argument is that this issue was fully argued in his

Motion to Suppress Evidence in the underlying District Court case. The records and evidence in

this case show that Harris' contention was fully argued, but decided against him. In his Motion

to Suppress, Harris argued that his statements to the officers were coerced. That motion raised

the following issue:

> 1. On February 18, 19, 22, 26, and 27, 2010, and throughout the investigation,
> Defendant allegedly made statements to law enforcement officers including, but
> not limited to, Lieutenant Bledsoe and Officer Gregg Ourth of the Scott County
> Sheriff's Department. Any statements, oral or written, made by defendant were
> elicited by coercion and without defendant being advised of and afforded his
> rights under the Fifth Amendment of the United States Constitution, and said

22

statements are therefore involuntary and inadmissible.

(Harris' Motion to Suppress Evidence and Statements, DCD 95, p. 1)

      Harris' evidence at the hearing on the Motion to Suppress raised the issue of whether his statements to the officers were obtained by the use of coercion and presented evidence to support that claim, as noted below.

      Harris introduced evidence of his contact with Naomi Wince (referred to here as both Winston and Peaches) during his cross-examination of Officer Ourth:

| | |
|---|---|
| Butts: | Did you go anywhere else? Did you go to Naomi Winston's? Did you go to Peach's house when you out looking for the gun? |
| Ourth: | We went by and - - and spoke to her briefly. |

(MTS Tr. p. 58).

      Evidence was also presented concerning whether Harris was promised any benefit for confessing to his crimes. Harris' attorney cross-examined Officer Bledsoe about any benefits promised to Harris for his confession:

| | |
|---|---|
| Butts: | The prosecutor's asked you about promises. In fact, during the interview there were discussions regarding being charged in the state, potential time and things like that, wasn't there? In the interview on the 18th? |
| Bledsoe: | I'm sorry, in - - in my interview on the 18th? |
| Butts: | Uh-huh. |
| Bledsoe: | I - - I think we had some conversation about that, but I explained to Mr. Harris that that's something that wouldn't be up to us, it would be up to the prosecutor. |

23

Butts:       And that was something that you explained at the very end, but prior

             to that time he talked to you about long term drug treatment and how he

             needed drug treatment and things like that; correct?

Bledsoe:     Yes, sir.

(MTS Tr., DCD 109, p. 23)

In order to rebut Harris' contention that Harris had been promised some kind of leniency

in exchange for his confession, the Government submitted as an exhibit during the hearing a

letter written by Harris and sent to Scott County Circuit Court Judge David Dolan, Scott County

Prosecutor Paul Boyd and Harris' state defense counsel, in April, 2010. (MTS Tr., DCD 109, p.

44, Exh. 10)  In that letter, Harris is again asking for leniency in his state case, showing that

there was no deal in place at the time of his February, 2010, confessions.

Harris' attorney cross-examined Officer Ourth extensively as to any promises of leniency

made by Ourth and/or coercive interviewing techniques:

Butts:       Now, on the - - the first interview on the 26th you did in fact tell Mr.

             Harris on several occasions that he needed to "man up" and give you

             something so you could go to Paul Boyd, the prosecutor; correct?

Ourth:       Yes. He continuously - - at the beginning of the interview he

             continuously was asking that if he could get some type of leniency,

             that he was worried about it going to a federal - - or to a federal

             level, the charges going to be federal charges to his state charges. And

             I told him I could not make him any promises in any way. That the

             only thing that I could do was speak to Mr. Boyd the state prosecutor

             and - - in relation to his charges at a state level.

24

Butts:          Well, in fact it's correct that you are the one who raised the issue that it would go to the ATF. On that first interview he never mentioned it's going fed; isn't that correct?

Ourth:          He had talked about it going to a - - to a federal level or he had mentioned it to be about - - being picked up by the feds as his exact statement way back during the first time that we talked.

Butts:          And what time would that have been? Would that have been the 18th? February 18th?

Ourth:          Possibly.

Butts:          All right.   Because it's not - - you're the one on the - - on the 22nd, the first interview, you at one point tell him that Paul Boyd's talking about 30 years. If you give me something to give Paul Boyd, you're looking at 30 years now, something might be looking at 5 to 10 instead of 30. Do you recall saying that?

Ourth:          Yes.

Butts:          So you in fact said several times that he needs to "man up' and that he's looking at 30 years unless he would give you something on the case; correct?

Ourth:          He stated that - - after he told me of the crimes he had committed, I told him at that point - - he kept telling me that he was sorrowful for what he had done, that he shouldn't have done it, that he was under the influence of crack cocaine at the time he done it, and that, you know, he wanted to get the least amount of time. And he continuously was

25

requesting long term drug treatment due to the addiction that he had.

Butts:      You don't remember telling him that whether it was bad crack or bad
            dope or whatever it was, you were wigged out?

Ourth:     That who was wigged out?

Butts:      He was wigged out at the time the assault occurred? Mr. Harris was

            wigged out?

Ourth:     No.

Butts:      Okay.   Did - - a fair summary, and obviously you don't have the audio

            in front of you and it would be unfair to ask you to recall everything

            exactly as you said, but it would be fair to say that you did in fact did talk

            to him about Mr. Harris providing you with something so you could make

            a deal with the state prosecutor, so you could get less than 30 years, is

            that - -

Ourth:     In a way, yes.

Butts:      Well, in a way, but I believe your exact statement was, if you give me

            something to give to Paul Boyd, you are looking at 30 years, give me

            something, might be looking at 5 to 10 years instead of 30.

Ourth:     I had talked to him. He kept asking me about - - in that same statement,

            that he was wanting something - - something less, that he was 50 years

            old, that he couldn't do a drastic amount of time, and that he wanted

            something less than that. And I told him that I didn't have anything

            and I could not make him any promises. I repeated that to him numerous

            times. And that the only thing I could do was to, for all his honesty, is to

26

> go to Mr. Boyd at the time and tell him that he had actually been honest
> with me.

Butts:      Had you already talked to the federal prosecutors at that time?

Ourth:      No.

Butts:      Okay. When did you talk to the federal prosecutors?

Ourth:      I wasn't the one that actually talked to the federal prosecutors. That was
            Detective Brandon Caid that actually made contact with the federal
            people.

Butts:      Do you know when that was?

Ourth:      No, I do not.

Butts:      Months afterwards? Days afterwards? Minutes afterwards?

Ourth:      It was probably between two weeks and 30 days.

(MTS Tr., DCD 109, pp. 51-54)

The fact is that Harris was interviewed several times and that each interview was
examined by the Magistrate Judge to determine whether any statement of Harris was coerced.
In his Report and Recommendation, later adopted by the District Court, Judge Blanton rejected
Harris' claim that any of his interviews were coerced. Because the interviews involved several
crimes committed by Harris, the entire section of the Report and Recommendation dealing with
this issue is helpful in showing that: (1) Harris' issue has been fully litigated, and (2) that there
was no coercion on the part of the officers investigating Harris' crimes. The relevant section of
the Report and Recommendation issued by Judge Blanton is set out below.

**Report and Recommendation:**

**Factual Background**

27

On January 28, 2010, at around 8:30 P.M., the Amerimart convenience store in Benton, Missouri, was robbed by a man wearing a Halloween mask. The man entered the store and fired a round through the ceiling of the store with a handgun that he carried into the store. The handgun was a semiautomatic handgun which ejected the spent hull on the floor. That hull was later recovered by Scott County officers. It was a hull from a 9mm caliber round. The man was holding a paper bag as he entered the store. The man approached the clerk and told her to "give him the money." The clerk took approximately $1,533.00 in cash from her cash register and placed it in the bag. The man picked up the bag and walked out of the store. The clerk did not know the identity of the man. Law enforcement officers were contacted immediately after the robbery. The clerk told the officers that the man was fully covered by clothing. The officers looked for anyone connected with the robbery but did not locate anyone that evening who might have been involved.

On February 17, 2010, a man named Billy Ray brought Contessa Daniel to a Sikeston hospital. Ms. Daniel had suffered a head injury and was bleeding profusely.  Officers were called to the hospital.   Deputy Jeremy Perrien spoke with Mr. Ray, who stated that he had driven by Ms. Daniel's home to check on her as she was pregnant. He found Ms. Daniel bleeding from a head wound. He reported that Ms. Daniel told him that Jim Harris had attacked her, causing her injuries. Other officers went to Ms. Daniel's home. They discovered a large amount of blood in the home and a bullet hole in a wall. They also found some loose change on the floor in the bedroom.  The officers took several photographs of the interior and exterior of the home. The officers began looking for Harris to question him about the assault. Mr. Harris also goes by the nickname of "Bug."

Approximately four to five hours after the assault, Charleston police officers located and arrested Mr. Harris in Charleston, Missouri. Scott County Deputy Perrien drove to Charleston and transported Mr. Harris back to the Scott County Sheriff's Office. Mr. Perrien and Mr. Harris spoke about their families on the drive back but did not discuss anything concerning the investigation.

On February 18, 2010, Scott County Lt. Bledsoe spoke with Mr. Harris. That conversation was audio recorded. Mr. Harris told Bledsoe that he did not want the interview to be video recorded but would consent to the audio recording only. Before the interview or the recording started, Bledsoe read Mr. Harris a Miranda warning from a card that Bledsoe carries for that purpose. Mr. Harris said that he understood the warning and was willing to speak with the officers. Mr. Harris signed a Miranda waiver form acknowledging his consent. When the audio recording began, Bledsoe reminded Harris that he had been given a Miranda warning. Harris agreed that he had received that warning and even repeated back the basic tenets of that warning.  Mr. Harris then admitted that he had struck Ms. Daniel with either a small pole or some other small object. Mr. Harris said that he had previously purchased some cocaine base from Ms. Daniel that evening and that he returned to obtain some of the drug on credit, as he was out of money. Mr. Harris said that Ms. Daniel refused to give him any drugs and that Mr. Harris struck her in response. Mr. Harris admitted that he took a small jar of change from Ms. Daniel's home as he left. Mr. Harris said that he went to the Daniel home by himself and that he bought cocaine base from another supplier in Charleston with the change he took from the Daniel home.

On February 19, 2010, Mr. Harris spoke with Scott County Sheriff Rick Walters.  That interview was video recorded. In that interview, Harris asserts that he did not commit the assault but blamed it on others. On February 22, 2010, Harris spoke with Captain Gregg Ourth

29

and again stated that the assault was committed by Timothy Winston and not Mr. Harris. Mr. Harris did not talk about his involvement in the Amerimart robbery during any of these interviews.

On February 24, 2010, Ms. Daniel had recovered from her injuries sufficiently to speak with Scott County Officer Ourth. She told him that Jim Harris had assaulted her by striking her repeatedly with a handgun. Daniel told the officer that, during the assault, the handgun went off, but that she was not struck. She said that Harris took some cash and a jar of coins from her bedroom and left. The officers went back to her home and seized a live 9mm caliber round from her home.

Daniel also told the officer that, about two weeks earlier, Harris had told her that he was the person who robbed the Amerimart store in Benton. After hearing that, the officers applied for a state search warrant to search Mr. Harris's home to look for items used in that robbery. The officers were aware that another robbery had been committed in Charleston, Missouri, by a man wearing a Halloween mask and carrying a handgun. The outward appearance of each robber was similar. The search warrant application requested permission to search Mr. Harris's home for items related to the two robberies. The state judge examined the search warrant application and its attached affidavit. After that review, the state judge approved the issuance of the search warrant and signed it. The search was conducted on February 24, 2010.

During that search, the officers found and seized several rounds of various calibers of ammunition, a pellet pistol from a burn barrel at the rear of the home and some men's clothing.

On February 26, 2010, Officer Gregg Ourth conducted two interviews, each of which was video recorded. Ourth gave Harris a Miranda warning prior to speaking with him. In the

second of those interviews, Harris confesses to assaulting Daniel with the handgun and that he

robbed the Amerimart store in Benton with an accomplice who drove the vehicle used to get

away from the scene. He stated that he used the same firearm to rob the store that he used to

assault Daniel. Harris also admitted that he robbed a Casey's store in Charleston, Missouri, on

January 22, 2010, and said that he used the pellet handgun found at his home to accomplish that

robbery. On February 27, 2010, Ourth typed up a list of questions that he asked and Harris's

answers.  The beginning of that written statement was a Miranda waiver form.  Harris initialed

all of the questions and answers, signifying that he was waiving his Miranda rights and that the

answers were true and correct.

Harris was interviewed a total of six times by law enforcement officers. Those

interviews occurred as follows:

| | | |
|---|---|---|
| February 18, 2010 | Lt. Jerry Bledsoe | Audio |
| February 19, 2010 | Sheriff Walter | Video |
| February 22, 2010 | Captain Gregg Ourth | Video |
| February 26, 2010 | Captain Gregg Ourth | Video |
| February 26, 2010 | Captain Gregg Ourth | Video |
| February 27, 2010 | Captain Gregg Ourth | Typed Q & A |

The interview of Harris on February 18, 2010, concerned the assault of Contessa Daniel.

In that interview, Harris stated that he struck Daniel with a small pole or small object. In the

interview on February 19, 2010, Harris claimed that another person assaulted Daniel. Harris

continued with his claim that another person assaulted Daniel during the interview on February

22, 2010. In the second interview on February 26, 2010, Harris admitted that he assaulted

31

Daniel. In addition, he admitted that he committed the Amerimart and Casey's robberies. On

February 27, 2010, Ourth typed the Miranda warning he gave to Harris before the first interview

on the 26th, along with the questions that were asked on the 27th and Harris's answers. Harris

was shown the typed sheets and asked to verify his responses to the questions. Harris read the

responses and initialed each response, signifying his agreement that the response was true and

correct.

(Report and Recommendation, DCD 129, pp. 1-18)

Judge Blanton set out Harris' coercion claims in the Report and Recommendation, as

well as his ruling on whether Harris' statements were voluntary or coerced:

> The gist of much of Defendant's Memorandum in Support of his Motion to
>
> Suppress Evidence and Statements is that the statements obtained from Mr. Harris
>
> were obtained by coercion. Memorandum, p. 9.

(Report and Recommendation, DCD 129, p. 18)

Judge Blanton's decision finding that Harris' statements were all voluntary is set out

below:

> The undersigned finds that the statements made by Defendant Jim Harris during
>
> interviews on February 18, 2010, and the two interviews on February 26, 2010,
>
> were made voluntarily and are admissible. These are the taped interviews the
>
> government intends to introduce at trial.

(Report and Recommendation, DCD 129, p. 20)

At the Motion to Suppress, Harris contended that all of his statements should be

suppressed. Judge Blanton set out Harris' complaint as follows:

**Written Confession of February 27, 2010**

32

The defendant states in his post-hearing memorandum (Document #114, p. 11):

> Because the custodial interview of February18, 2010 was made without benefit of *Miranda* warnings, that interview must be suppressed. Similarly, the audio and video taped interviews of February 26, 2010 were as a result of coercion and undue influence exerted by law enforcement. They must also be suppressed. The written confession that occurred on February 27, 2010, Evid. Hrg. Ex. 6, followed law enforcement's violations of Defendant's constitutional rights, and must be suppressed.

The court has found that the interviews on February 18, 2010, and February 26, 2010

(both interviews on February 26) were voluntarily given after Miranda warnings. As a result,

the defendant's argument related above that because of constitutional violations on February 18

and 26, the written confession of February 27 should be suppressed, is without merit. The

question and answer confession (Government's Ex. #6) follows written Miranda warnings.

Each warning is followed by the initials "JH" placed there by Mr. Harris. (Tr. 36).

There follows under the word "Waiver" the questions:

1. Do you understand each of these rights I have explained to you? and

2. Having these rights in mind, do you wish to talk to us now?

Next to both the above questions appear the words: "Yes/No." Following each question the Yes

is circled and the initials JH are printed next to each Yes. Id.

There follow questions and answers. The question (from Ourth) is typed and the answer

(from Harris) is typed. Next to each answer are the initials JH. At the bottom of each page

appear the signature of the defendant and Officer Ourth. On page 7 of the statement are the

signatures of Jim Harris as the "Signature of person giving statement" and Gregg Ourth as the

"Signature of officer taking statement."

The defendant saw the statement after it came off the printer. Harris had the opportunity

33

to correct any of the answers "that I had typed out was verbatim, exactly what he told me." Mr. Harris did not make any corrections. He initialed after each answer. (Tr. 36-37).

The question and answer statement, Government's Exhibit 6, was voluntarily given by the defendant after Miranda warnings and is admissible at trial.

(Report and Recommendation, DCD 129, pp. 20-22)

The Report and Recommendation of Judge Blanton, later adopted by the District Court, clearly demonstrates that Harris' statements were not coerced by any law enforcement officer. The record from that suppression hearing and the Magistrate Judge's findings conclusively show that Harris' claim that his statements were coerced is factually incorrect.

This Court has set out all the testimony from the hearing on Harris' Motion to Suppress, excerpts from Harris' Motion to Suppress and the Report and Recommendation just to show that Harris' issue raised in this Section 2255 petition has already been fully litigated. Harris lost the issue as to whether his confessions were coerced based on police officer representations in the Motion to Suppress Hearing and he lost again when the District Court adopted the Report and Recommendation of the Magistrate Judge. Harris attempted to appeal that decision pro se, but failed to correctly raise it. In Harris' pro se appellate filing, styled "Violation of Due Process Fourteenth Amendment", Harris contended that there was a deal to take Harris to see his girlfriend Naomi Wince in exchange for a guilty plea. (P. 4) He did not claim that this action resulted in a coerced confession. The Eighth Circuit denied Harris' claims, noting that his guilty plea waived all defects in the suppression ruling. *United States v. Harris, 499 Fed.Appx. 631, 632* (8th Cir. 2013). Significantly, Harris did not raise the issue in his brief as to whether his confessions were coerced or that the District Court's rulings on the

34

Motion to Suppress were incorrect. The Eighth Circuit noted that Harris could file a Section 2255 petition and claim that his guilty plea was not voluntary, but Harris has once again failed to raise the proper ground for this motion by not raising that ground. Instead, Harris contends that this Court should again litigate whether Harris' confessions were coerced. If Harris would have wanted to appeal that issue, he should have proceeded to trial and then appealed the District Court's decision as to the suppression issue. But he did not do so and cannot now claim in a Section 2255 proceeding that the District Court erred.

Other cases have discussed a defendant's procedural waiver of a constitutional issue and whether that claim can be resurrected in a Section 2255 petition. The defendant in *Dejan v. United States*, 208 F.3d 682 (8th Cir. 2000), attempted to raise just such an issue. Like Harris here, Dejan pled guilty to charges in his indictment and was sentenced. Later, after a Supreme Court case clarified the law concerning one of Dejan's charges, Dejan filed a Section 2255 petition to challenge his conviction, alleging actual innocence. Harris also claims actual innocence, although his petition is woefully short on facts to support that claim.

The *Dejan* Court noted that the defendant did not challenge the validity of his guilty plea in a direct appeal. *Dejan*, 208 F.3d at 685. The Court then noted, "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice or that he is actually innocent. *Id.* Since Dejan had not succeeded in showing either, his Section 2255 petition was dismissed.

The defendant in *United States v. Morgan*, 230 F.3d 1067 (8th Cir. 2000), also claimed constitutional error in his conviction. Again, that alleged error was not considered because

35

Morgan had failed to file a direct appeal of that constitutional issue, therefore, his issue was procedurally defaulted. *Morgan*, 230 F.3d at 1069.

Harris has procedurally defaulted the issue of whether his confessions were coerced by failing to go to trial and then appealing the suppression decision of the District Court. He cannot get around that procedural default. Harris attempts to claim the actual innocence exception to that rule, except that he provides no reason to believe that he was not actually guilty. Harris' sworn statements at his guilty plea hearing and the written statements in his Plea Agreement conclusively establish his guilt. Harris does not offer any factual explanation as to why he is actually innocent; he merely claims that status without proof.

This Court has once before decided that Harris' confessions were voluntary and not coerced, based on the same claims that Harris makes again. Harris has not raised any reason to believe that this Court's decisions were in error. This issue will be dismissed.

**Ground two. Harris was denied his right to represent himself at trial.**

In this ground, Harris claims that he was denied the right to represent himself. This Court has already identified one excerpt of a conversation between this Court and Harris at Harris' guilty plea where Harris maintained that he was satisfied with defense counsel. In spite of that, Harris maintains that he was denied his right to represent himself, claiming:

> The court then decided that since the laws were changing and the prosecutor had access to legal materials that Harris could not get to, the court denied the right for Harris to represent himself.

(Harris' Section 2255 Petition, p. 3)

Harris sets out that his denial of his right to represent himself occurred during a hearing on August 29, 2011. This is not the first time that Harris has misquoted a record from this Court

36

and this Court doubts that it will be his last. There is a transcript of exactly what was said during the hearing on Harris' request and it does not support his claim.

At the end of a long hearing, the following exchanges were had between Attorney Butts, Harris and Judge Blanton:

| | |
|---|---|
| Court: | Did I understand you correctly that if you got a transcript of this hearing, that you want Mr. Butts to still represent you? |
| Harris: | Yes, sir. |
| Court: | Fully represent you? |
| Harris: | Yes, sir. |
| Court: | Because that's what he - - he said he would be standby, but he can't represent you in part. |
| Harris: | Okay. I understand that. |
| Butts: | Excuse me. You need to decide what you want to do. |
| Harris: | I just did. |
| Butts: | Well, Jim - - |
| Harris: | I just - - I just explained to the judge that I want you to represent me in full. |

(August 29, 2011 Hearing Tr., pp. 21-22)

| | |
|---|---|
| Butts: | Sure. Yeah. No, and, again, I don't have any problems with Mr. Harris. I mean, I have said to him here today, I think it's something that we'll probably continue to need to make clear.  I'm certainly not upset by what he did or made or (inaudible). It's an important proceeding in his life. He has a right to be concerned. |

37

| Court: | Mr. Harris, you want to say something, I think. |
| Harris: | No, I'm finished. |
| Court: | Okay. So Mr. Butts is going to continue to represent you fully. |
| Harris: | Yeah. |

(August 29, 2011, Hearing Tr. pp. 25-26)

It is abundantly clear from the transcript that Harris did not seek to represent himself. He agreed that Eric Butts would continue to represent Harris. The records and files of this case conclusively establish that Harris' contention that he was denied the right to represent himself is false. This issue will be dismissed by this Court.

**Ground three.**     **Harris' Motion asking that the Government be required to dismiss his Indictment.**

Harris filed, in the habeas case, two motions asking for an Order directing the Government to dismiss his case. He sets out several grounds for his requests, including his assertion that Harris' arrest was illegal, that the Government manufactured evidence against Harris in a state case, that he was coerced into making his confession as a reward for being allowed to see his girlfriend, that the Government improperly admitted evidence of Harris' recorded interviews, that the Government obtained copies of the sealed transcript of the August 29, 2011, where Harris discussed his wishes as to who would represent him, that Harris has not yet been provided a copy of the audio recording of the hearing from the court reporter held on August 29, 2011, and that the Assistant United States Attorney has a personal vindictiveness against Mr. Harris.

As to the first of these sub-issues, there are no facts that would show that Harris' arrest

38

was unlawful and Harris has not set out any of those facts in his Motion. There is no proof of any manufactured evidence in this case, in spite of Harris' claims. The issue of whether Harris' confession was coerced has already been ruled against Harris in a previous hearing before this Court. There is no reason why the recordings of Harris' jailhouse interviews would not be admissible. Those interviews have been held to be admissible by Judge Blanton. While Harris complains that the Government improperly obtained a copy of the transcript of the hearing on August 29, 2011, the docket sheet will reveal that the Government filed a motion requesting permission to obtain a transcript of that hearing in order to respond to Harris' motions. That request was granted. Harris' claims that the Government improperly obtained a copy of that transcript are simply incorrect. There is no basis to order the court reporter to produce an audio recording of the August 29, 2011, hearing and this Court will not require that reporter to provide that audio recording. Finally, the Assistant United States Attorney has simply vigorously prosecuted this case. Harris' claims that the Government has proceeded in a vindictive fashion are simply not borne out by the facts of this case. In fact, when Harris decided to plead guilty, his attorney asked the Government to withdraw its Notice of Sentencing Enhancement. That Notice would have required the Court to impose a mandatory life sentence for Harris for his prosecution for either the Hobbs Act robbery

count or the count involving his Possession of the Firearm in Furtherance of a Crime of Violence. The Government withdrew that Notice at the request of Harris' attorney, showing the Government's good faith in trying to work with Harris. Harris has not presented any evidence of vindictiveness. Any issue raised by this Motion will be dismissed.

**Ground four.          Harris' Motion that the Government be prohibited from contacting**

**his witness, Naomi Wince.**

The Government represents that it has not attempted to contact Ms. Wince during any of these proceedings, but Harris has no right to demand that it not contact her. Harris states that Wince is "under his pro se status of being her counsel" and demands that the Government seek his permission before contacting her. Of course, there is no such status. While Harris may represent himself, he may not represent any other party or person. Harris does not set out any valid reason why this request should be considered in a Section 2255 proceeding and it will not be considered here.

## CONCLUSION

For the foregoing reasons, the Petition filed by Jim R. Harris is denied without an evidentiary hearing, and this Court enters Judgment finding the issues raised in his Petition in favor of the Government. No evidentiary hearing is required when the allegations of the Section 2255 petition cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact. *Engelen v. United States*, 887 F.2d 843, 844 (8th Cir. 1989). The records of Harris' case conclusively establish that Harris' claims are refuted by the record.

SO ORDERED this 13th day of May, 2020

STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE